**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**District Judge Christine M. Arguello**

Civil Action No. 20-cv-02791-CMA

MACYO JOELLE JANUARY,

     Applicant,

v.

LENGERICH, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

     Respondents.

---

ORDER DENYING APPLICATION FOR HABEAS CORPUS

---

The matter before the Court is an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 filed *pro se* by Applicant. *See* ECF No. 8.

**I. Background**

Applicant, a juvenile at the time the crime was committed, was convicted by a jury of two counts of first-degree felony murder as to each victim, for a total of four murder convictions, and two counts of first-degree burglary as to each victim, for a total of four burglary convictions. in El Paso County District Court Case No. 13CR312. *See State of Colo. v. January,* No. 14CA2358, 28-29 (Colo. App. Feb. 14, 2019); ECF No. 27-1 at 29-30. Applicant was sentenced to two consecutive life sentences with the possibility of parole after forty years for each murder victim, followed by two consecutive thirty-two-year sentences for each victim for the burglary. *Id.* On direct appeal, the

1

Colorado Court of Appeals (CCA) vacated three of Applicant's four first-degree burglary convictions under double jeopardy principles, and two of Applicant's four first-degree murder convictions and remanded the case for modification of Applicant's sentence, but in all other respects the CCA affirmed Applicant's convictions.  *See January,* No. 14CA2358 at 28-35; ECF No. 27-1 at 29-36.  The Colorado Supreme Court (CSC) denied Applicant's petition for certiorari review.  *See January v. People of the State of Colo.,* No. 2019SC220 (Colo. Sept. 3, 2019); ECF No. 27-6.

Pursuant to his revised sentencing ordered by the CCA, entered on October 22, 2014, Applicant is serving two consecutive, mandatory life sentences, with the possibility of parole after serving forty years in each, plus a thirty-two-year sentence. *See* No. 13CR312, Court File at pp 529-31.

In the CCA's order on direct appeal, the CCA summarized the underlying facts of the criminal case as follows:

W.B. and D.D. were a married couple.  Around noon on a weekday in January 2013, W.B. and D.D. were notified that their home security alarm had been tripped.  W.B. and D.D. left work and returned home together.  They arrived before the police and entered their home, where they were both fatally shot, each by a single gunshot.

A neighbor witnessed a young man exit the house with a duffel bag and attempt to drive away in W.B.'s car.  The car rolled out of the driveway but stalled in the street. The neighbor got the attention of a group of tree trimmers working nearby.  When the three tree trimmers approached the car, the young man got out of the car and ran away on foot.  The tree trimmers then approached W.B. and D.D.'s house and saw two dead bodies.  The men then alerted their company's dispatcher, who, in turn, called the police.

Several minutes later, the neighbor and tree trimmers saw a young man walk back up the street, retrieve a gun from W.B.'s car, and enter the house.  When a police officer arrived moments later, the young man fled

2

through the back door.  Additional officers arrived and gave chase.  While fleeing from the police officers, the young man dropped two guns in the street.  The young man evaded the officers by fleeing across a major street and through a fence near Timbers Apartment Complex.

The police identified January as a suspect after they were contacted by the principal at Zeb Pike, a juvenile detention facility. January's friend, T.G., had delivered a commencement speech at a school within the facility.  On the morning T.G. delivered the speech, staff members contacted the police and told them that they had learned information about a multiple murder.  After receiving the call, the police came to Zeb Pike, where they interviewed T.G.  T.G. told the police that January had confessed to having shot someone.  Shortly thereafter, the police located January at a friend's house, where they arrested him.

January was seventeen years old at the time of his arrest (and when the alleged crimes were committed).

At trial, January's theory of defense was that he arrived at the scene after someone else had murdered W.B. and D.D.  He conceded that he walked up to W.B.'s car, removed a gun, entered the house, and later fled through the back door when the police arrived, but denied that he was the person who killed W.B. or D.D.

The neighbor and tree trimmers who were outside W.B. and D.D.'s house on the day of the incident also testified.  Each testified that the man who walked back up the street and entered W.B. and D.D.'s house was the same individual who had run away several minutes beforehand.

T.G., three Zeb Pike staff members, and Detective John Koch (who interviewed T.G.) also testified.  The staff members testified that, on the day T.G. gave a speech at Zeb Pike, she had told them that January had, the previous night, confessed to her that he had broken into a house and fatally shot people inside. Detective Koch testified that T.G. told him that January had told her that he shot someone.  At trial, T.G. denied or said she did not remember making these statements.

The prosecution also presented testimony from G.V., who was in custody with January at the juvenile detention facility after January's arrest. G.V. initially told prosecutors that January had confessed the murders to him.  G.V. ultimately testified, however, that his initial statements to prosecutors were false and that he had only heard about January's confession from others.

The prosecution also introduced fingerprint and DNA evidence, including evidence that January's fingerprint was found on an ammunition case inside the duffle bag recovered from W.B.'s car. The police also recovered two guns — a Walther and a Springfield — that January dropped in the street when he ran from the police on the day of the murders. January's DNA was also found on both guns, including the murder weapon (the Walther). DNA evidence from other, unidentified contributors was also recovered from each gun.

*January*, No. 14CA2358 at 2-5; ECF No. 27-1 at 3-6.

Applicant filed the 28 U.S.C. § 2254 Application, ECF No. 8, on November 23, 2020, which is the operative pleading before the Court. On December 3, 2020, the magistrate judge directed Respondents to file a Pre-Answer Response and to address the affirmative defenses of timeliness under 28 U.S.C. § 2244(d), and exhaustion of state court remedies under 28 U.S.C. § 2254(b)(1)(A) if Respondents intended to raise either or both in this action. *See* ECF No. 9. Respondents filed a Pre-Answer Response, ECF No. 18, on January 22, 2021, in which they stated that they do not assert the defenses of untimeliness or of failure to exhaust state court remedies.

On March 11, 2021, Respondents were directed to file an answer in compliance with Rule 5 of the Rules Governing Section 2254 Cases that fully addresses the merits of Applicant's claims. *See* ECF No. 19. Applicant was told he may file a reply within thirty days of Respondents filing of an answer. *Id.* On June 11, 2021, Respondents filed an Answer, ECF No. 27, and Applicant filed a Reply, ECF No. 31, on July 7, 2021.

After reviewing the Application, the Answer, the Reply, and the state court record, ECF No. 24, the Court has determined that the Application can be resolved on the parties' briefing and that an evidentiary hearing is not necessary. Under Rule 8(c) of the Rules Governing Section 2254 Cases in the United States District Courts, only when

4

an evidentiary hearing is warranted must the judge appoint an attorney to represent an applicant who qualifies to have counsel appointed under 18 U.S.C. § 3006A.

The Application is denied and the action dismissed, for the following reasons.

## II. Claim on the Merits

Applicant raises one claim for a review on the merits:  Overall, he asserts that his sentence is unconstitutional based on *Miller v. Alabama,* 567 U.S. 460 (2012), because *Miller* prohibits a sentence of life without parole for juvenile offenders.  ECF No. 8. Applicant contends that he was sentenced after *Miller* was decided, but *Miller* is to be applied retroactively.  *Id.* at 4 and 8.  Applicant maintains that Colo. Rev. Stat. § 18.1.3-401(4)(b), a violent sentence enhancer, requires his sentences be served consecutively. *Id.*  He further contends that his sentence is de facto life without parole (LWOP") because he was sentenced on October 22, 2014, to two life sentences that require him to serve forty years for each sentence before he is considered for parole, plus he has a sixty-four-year sentence, in which he must serve seventy-five percent of the sentence before he is considered for parole, a total of over 100 years, in violation of *Miller* and the Eighth Amendment.  ECF No. 8 at 6.  Applicant asks his sentence to be reversed, and he be granted full relief.  *Id.* at 14.

## III. Legal Standards

Section 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court, unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"The starting point for cases subject to § 2254(d)(1) is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims."  *Marshall v. Rodgers*, 569 U.S. 58, 61 (2013) (per curiam).

**IV. Analysis**

In *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court held that the Eighth Amendment is violated when a juvenile offender who did not commit a homicide offense is sentenced to life in prison without a meaningful opportunity for release.  *Id.* at 82.  More specifically, the Supreme Court held that a state need not "guarantee eventual freedom to a juvenile offender," but at least it must provide "some meaningful opportunity to obtain released based on demonstrated maturity and rehabilitation."  *Id.* at 75.

Further, as applicable to this Court's analysis, in *Budder v. Addison*, 851 F.3d

1047 (10th Cir. 2017), the Tenth Circuit addressed the scope of the clearly established

federal law in *Graham*:

> We conclude, first, that the "sentencing practice" considered
> by the Court [in *Graham*] includes any sentence that would
> deny the offender a realistic opportunity for release in the
> offender's lifetime; second, that the Court's analysis
> regarding "the nature of the offense" applies to all
> nonhomicide offenses, regardless of the number or severity
> of those offenses; and, third, that the Court's analysis
> regarding "the characteristics of the offender" applies to any
> offender who was under the age of eighteen at the time of
> his or her offense.

*Budder,* 851 F.3d at 1055.  The Tenth Circuit in *Budder* held a juvenile offender's

consecutive sentences that would lead to parole eligibility only after serving more than

131 years violated the Eighth Amendment.  *Id.* at 1059.  The Tenth Circuit also stated in

*Budder* that *Graham* applies to both individual sentences for individual offenses, and to

aggregate sentences that preclude release solely due to the consecutive imposition of

multiple sentences for multiple crimes.

Most recently, the Tenth Circuit applied *Budder* to a Colorado sentence in *Rainer*

*v. Hansen,* 952 F.3d 1203 (10th Cir. 2020).  Even though in *Rainer* the Tenth Circuit

found the Colorado Court's rejection of *Rainer's* aggregate sentence claim contrary to

*Graham,* the Tenth Circuit went on to find, pursuant to *de novo* review, that Colorado

law provided sufficient opportunity for *Rainer* to be eligible for release as early as forty-

two years old under the Juveniles Convicted as Adults Program (JCAP).  *Id.* at 1205,

1211.

The relevant question in determining whether a sentence is too long for the

purposes of *Graham* is when parole eligibility or other realistic opportunity for release will occur.  *See Budder*, 851 F.3d at 1059 (offender's consecutive sentences with parole eligibility only after serving more than 131 years violates Eighth Amendment because not "realistic opportunity for release"); *United States v. Mathurin*, 868 F.3d 921, 935-36 (11th Cir. 2017) (no *Graham* violation because juvenile offender has opportunity to obtain parole eligibility during lifetime with good behavior); *see also Montgomery*, 560 U.S. at 212 (noting that under *Miller* "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them.").  The Court, therefore, concludes it is clearly established federal law that the rule in *Graham* applies not only to a single sentence to life without parole for a single offense by a juvenile, but also to consecutive term-of-years sentences for multiple offenses, *Budder,* 851 F.3d at 1058, which in keeping with *Miller*, applies in imposition of life-without-parole on a juvenile in a homicide offense, *see Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016).

As noted above, pursuant to his revised sentencing ordered by the CCA and entered on October 22, 2014, Applicant is serving two consecutive, mandatory life sentences, with the possibility of parole after serving forty years in each.  Contrary to Applicant's claim that he is subject to two thirty-two-year sentences, he is serving one thirty-two-year sentence, which is subject to reduction based on good behavior.  *See* No. 13CR312, Court File at pp 529-31.  On direct appeal, the CCA rejected Applicant's *Miller* argument based on CSC decisions in "*Lucero v. People,* 2017 CO 49, *Estrada-Huerta v. People,* 2017 CO 52, and *People v. Rainer,* 2017 CO 50.  *See People of the*

*State of Colo. v. January,* No. 14CA2358, p. 36 (Colo. Feb. 14, 2019); ECF No. 27-1 at

37. The CCA rejected Applicant's argument because it is the same argument rejected

by the CSC in *Lucero, Estrada-Huerta,* and *Rainer,* that *Graham* and *Miller* do not apply

to consecutive term-of-years sentences imposed for multiple convictions. *Id.* As stated

above, Applicant's petition for certiorari review was denied. *See January,* No.

2019SC220; ECF No. 27-6.

"Even if the state court decision was contrary to, or involved an unreasonable

application of, clearly established federal law, [the Court's] analysis is not complete."

*Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006). "Unless the error is a structural

defect in the trial that defies harmless-error analysis, [the Court] must apply the

harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), . . ." *id.*; *see*

*also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (providing that a federal court must

conduct harmless error analysis under *Brecht* anytime it finds constitutional error in a

state court proceeding regardless of whether the state court found error or conducted

harmless error review).

Under *Brecht*, a constitutional error does not warrant habeas relief unless the

Court concludes it "had substantial and injurious effect" on the sentence imposed.

*Brecht*, 507 U.S. at 637. "A 'substantial and injurious effect' exists when the court finds

itself in 'grave doubt' about the effect of the error." *Bland*, 459 F.3d at 1009 (citing

*O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). "Grave doubt" exists when "the matter

is so evenly balanced that [the Court is] in virtual equipoise as to the harmlessness of

the error." *O'Neal*, 513 U.S. at 435. The Court makes this harmless error determination

based upon a review of the entire state court record.  *See Herrera v. Lemaster*, 225

F.3d 1176, 1179 (10th Cir. 2000).

Respondents contend that Applicant's sentence complies with *Miller,* because

Colorado's program for juvenile offenders provides him the opportunity for parole

beginning around the age of forty-six.  ECF No. 27 at 8.  Respondents further assert as

follows:

> As the Tenth Circuit discussed in *Rainer*, in response to *Graham* and *Miller*, in 2016 Colorado created the Juveniles Convicted as Adults Program (JCAP), providing juvenile offenders the opportunity to obtain life-skills training and early release.  *Rainer*, 952 F.3d at 1208-09; Colo. Rev. Stat. § 17-34-101 (2020).  An offender such as Applicant, who was convicted of first degree murder after deliberation, can apply for JCAP "after serving twenty-five years of his or her sentence," and upon meeting certain requirements, such as successfully participating in prison programs, demonstrating maturity and good behavior, accepting responsibility for the offense, and earning a high school diploma.  Colo. Rev. Stat. § 17-34-101(1); Colo. Dep't of Corrections Admin. Reg. 650-08, p. 2.  (footnote omitted).
>
> JCAP takes at least three years to complete and is designed to provide juvenile offenders the skills needed to successfully reintegrate into society.  *See* Colo. Rev. Stat. § 17-34-102(2) & (3).  Its curriculum thus includes topics such as independent living, vocational and educational training and opportunities, mental health, family reunification, and community support programs.  *Id.*; Colo. Dep't of Corrections Admin. Reg. 650-08, p. 3; App'x H at 7.  If, for some reason, an offender is initially denied admission or is terminated from the program, he or she may reapply every three years.  Colo. Rev. Stat. §§ 17-34-101(5), 17-34-102(6).
>
> Upon completing the program, an offender may apply for early parole.  *Id.* §§ 17-34-102(7); 17-22.5-403(4.5); 17-22.5-403.7(2).  The parole board must review the application within 90 days and make a recommendation to the governor, who may then grant early parole if there are sufficiently mitigating circumstances and if "the offender's release from institutional custody is compatible with the safety and welfare of society."  *Id.* §§ 17-22.5-403(4.5); 17-22.5-403.7(3).  Once an offender such as Applicant has served 30 years and completed the program, "unless

rebutted by relevant evidence, it is presumed" that he or she meets the criteria for early release. *Id.* § 17-34-102(8)(b). After release, the division of parole "shall provide parole supervision and assistance in securing employment, housing, and such other services as may affect the successful reintegration of the inmate into the community while recognizing the need for public safety." *Id.* §§ 17-22.5-403(6); 17-22.5-403.7(4). JCAP has been operating for several years now. *See Rainer*, 952 F.3d at 1209; App'x H at 5-6.

The existence of JCAP means Applicant's sentence complies with *Miller*. JCAP gives him the opportunity to begin seeking parole around age 46: he was almost 18 at the time he began serving his sentence; he can apply for JCAP after serving 25 years; and he can complete the program in as little as 3 years. If he is initially denied or is terminated, he can re-apply every three years thereafter. *See* Colo. Rev. Stat. §§ 17-34-101(5), 17-34-102(6). And if he completes the program but, for some reason, is initially denied early release, then upon serving 30 years of his sentence he will be *presumed* to have met the criteria for release. *See* Colo. Rev. Stat. § 17-34-102(8)(b).

In *Montgomery*, the Supreme Court made clear that states "may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole." *Montgomery*, 577 U.S. at 212. And as an example, the Court pointed to a state statute it described as simply making "juvenile homicide offenders eligible for parole after 25 years." *Id.* (citing Wyo. Stat. § 6-10-301(c) (2013)).

Since merely extending parole eligibility to juvenile offenders after 25 years complies with *Miller*, JCAP not only complies – it goes beyond what *Miller* requires. It sets a similar timeframe for juvenile offenders to rejoin society, but it also provides the preparation and support they need to do so *successfully*.

ECF No. 27 at 8-10.

In his Reply, Applicant states that the acceptance rate for the JCAP is fifty percent. ECF No. 31 at 6. Applicant contends there are no "determined statistics" showing JCAP has helped provide an opportunity for release. He asserts that some juvenile offenders have yet to "go up for parole their second time" due to "the time of laws and programs." *Id.* He further contends that the

courts still must ensure there is a "reasonable" opportunity for release.  *Id.*
Applicant requests that his claim be granted, his sentence be vacated, and the
case be reversed and remanded.  *Id.* at 8.

As stated above, Applicant maintains that Colo. Rev. Stat. § 18.1.3-401(4)(b), a
violent sentence enhancer, requires his sentences be served consecutively and,
therefore, is illegal.  *Id.*  He further contends that his sentence is de facto "LWOP,"
because he was sentenced on October 22, 2014, to two life sentences that require him
to serve forty years for each sentence before he is considered for parole, plus he has a
sixty-four-year sentence in which he must serve seventy-five percent of the sentence
before he is considered for parole, a total of over 100 years, in violation of *Miller* and the
Eighth Amendment.

Based on this Court's findings, Applicant's arguments are without basis. First,
Applicant has two life sentences for two counts of murder subject to reduction based on
the JCAP program and one thirty-two-year sentence, not a sixty-two-year sentence as
he suggests, subject to early release based on good behavior.  Second, as stated in
*Montgomery,* 577 U.S. at 212, noting in related context under *Miller,* "[a] State may
remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for
parole, rather than by resentencing them."  Finally, the Supreme Court in *Graham* held
that a state need not "guarantee eventual freedom to a juvenile offender," but at least it
must provide "some meaningful opportunity to obtain release based on demonstrated
maturity and rehabilitation."  *Graham,* 560 U.S. at 75.

Given Applicant's ability to apply for participation in JCAP, after serving twenty-

five years of his sentence, he has been provided with some meaningful opportunity to obtain release based on maturity and rehabilitation.  The Court also finds that Applicant's claims regarding his anticipated inability to be accepted into the JCAP program are speculative.  It is premature to argue the JCAP program does not provide a meaningful opportunity for Applicant to obtain release.  Applicant has not served twenty-five years of his sentence at this time, which is one of the requirements he must meet to participate in the program.

As stated above, the relevant question in determining whether a sentence is too long for the purposes of *Graham* is when parole eligibility or other realistic opportunity for release will occur.  *See Budder*, 851 F.3d at 1059.  The record before the Court shows that Applicant has opportunities to obtain release on parole well within his life expectancy.

Under these circumstances, the Court finds that the state court's erroneous application of *Graham* is harmless under *Brecht*.  *See Mathurin*, 868 F.3d at 935 (no Eighth Amendment violation because juvenile offender has opportunity to become eligible for parole with good behavior at age 67); *Ira v. Janecka*, 419 P.3d 161, 169 (N.M. 2018) (juvenile offender's sentence to 91½ years in prison does not deprive him of a meaningful opportunity to obtain release because he can become parole eligible with good behavior at approximately age 62); *State v. Smith*, 892 N.W.2d 52, 64-66 (Neb. 2017) (sentence of 90 years to life in prison does not violate *Graham* because state law gave juvenile offender opportunity to become eligible for parole at age 62).

**V. Conclusion**

In summary, the Court finds that Applicant is not entitled to relief on his claim that his aggregate sentence violates the Eighth Amendment because he has the ability to seek admission in the JCAP program and to obtain release on parole within his life expectancy.  The Court also finds that Applicant's claims regarding his anticipated inability to be accepted into the JCAP program are both speculative and premature.  Accordingly, it is

ORDERED that the Application for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, ECF No. 8, is denied and this case is dismissed with prejudice.  It is

FURTHER ORDERED that the issuance of a Certificate of Appealability pursuant to 28 U.S.C. § 2253(c) is denied.  Applicant has not made a substantial showing of the denial of a constitutional right such that reasonable jurists could disagree as to the disposition of his Application pursuant to the standards of *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  *See* 28 U.S.C. § 2253(c)(2).  It is

FURTHER ORDERED that leave to proceed in forma pauperis is denied for the purpose of appeal.  The Court certifies pursuant to 28 U.S.C.  1915(a)(3) that any appeal from this order would not be taken in good faith.  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If Applicant files a notice of appeal he must also pay the

full $505 appellate filing fee or file a motion to proceed in forma pauperis in the United

States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed.

R. App. P. 24.

      DATED December 16, 2021.

                BY THE COURT:

                _____

                CHRISTINE M. ARGUELLO

                United States District Judge